Good morning. I have reserved two minutes for rebuttal. Okay. Keep an eye on the clock. We'll try to help you. I will be. May it please the Court, my name is Michael Korda of the Crawl Law Group, and I represent the GCIU-Employer Retirement Fund in these two appeals. This matter arises out of MNG Enterprises' withdrawal from the GCIU Retirement Fund, which is a multi-employer pension fund. ERISA and its amendments, including the multi-employer pension plan amendments, specify rules governing the withdrawal from a fund by an employer. Since one of ERISA's main purposes is to protect the retirement benefits of participants in pension plans, a withdrawing employer is responsible to pay its proportionate share of the underfunding it leaves behind. Counsel, can I ask just a question I didn't totally understand as we were going through the case? In 2006, the predecessor companies, they had fully withdrawn or had they partially withdrawn in 2006 before the acquisition occurred here? I don't think there is anything in the record as to whether they fully withdrew or partially withdrew. Okay, because I think there was some suggestion that they stopped making payments. This may not be relevant for the case, but I was trying to figure out. I assume the bottom line is that MNG came in after the purchase. There's no question that they made contributions for several years until 2014. Until they withdrew. Until they withdrew. Yeah, and the two newspapers were members of the control group that MNG and CNG were. But whatever withdrawal happened from the two predecessor companies, there was never a determination of withdrawal liability until 2018. Is that correct? Not that I'm aware of. It's not in the record if it is. Okay. That's interesting that you say that. That's not my understanding of the record. But let me ask you this. Are you aware of any instances, any case law, where the courts have extended successor liability in the manner that you're suggesting, specifically that an asset purchaser inherits not just the seller's liabilities at the time of the sale but also the factual circumstances that might materialize into liability years and years down the road? Any other case you could think of? Well, I mean, we did cite the Sofco case, Your Honor, which… You think that's on all fours? I think it's on all fours, yes, Your Honor. Does it make any sense? It's a different circuit, of course, but does it make any sense? You want to sell a business and you evaluate how much is owed. Accountants and actuaries are good at that. There's an obligation under ERISA to the fund. That can easily be calculated. What seems to me happened here is that you didn't do anything. And so all these years go by and all of a sudden these folks get trapped with something that they could have – you could have known about a long time before and now you're springing on them all these years later. And I don't – I'm aware of Sofco, but it doesn't make any sense to me how you Well, Your Honor, the problem here is the asset sales were back a while back, but MNG and the other control group members, whether the timing was several years or whether it was only one year, it doesn't really make a difference. What we're trying to do here is make sure that the fund is able to collect from the because their successor, MNG, is the successor to those But I understand your concept, but what I'm suggesting is that the successor liability that you want to engross on this, I don't know that that applies here. You can calculate at the time that the two newspapers were acquired exactly how much they owed to the fund. Exactly. And I imagine that in almost every instance that's what you do. It seems what's happened here, though, is that they got out. And then all these years later you're saying, well, we have the contribution record and you have successor liability and you're going to slam them for something that occurred, how could anybody know what they were going to be stuck with if they bought these things? Well, my answer to that is if you look at the asset sales, they knew what they were buying and they did continue to make contributions on behalf of the newspapers for several years. And then they decided, the control group decided, MNG decided to withdraw. So that's why we're saying that the Sofco case is on all fours. Can I ask a question? To Judge Smith's point, is that really relevant at the end of the day? Because in 2018, I guess I'm confused as to what was calculated, but wouldn't you be taking theoretically the fund value at the time and you're figuring out how to keep the fund solvent at that time? So in a way, the contribution history is important for how much has gone into it, but the liability, if the funds had done really well from 2006 to 2018 when the calculation was made, presumably that liability would have been less for MNG. Am I thinking about that correctly or is that not correct? That could be correct, Your Honor, but here the issue is, and I think we need to come back to the fact that this is MNG's burden of proof. We have the assessment. They need to show that the assessment is incorrect, and if they wanted to make a record about whether there were partial or full withdrawals prior, that was theirs to do and they never did that. Well, it seems like their strongest argument is that the interest rate that was used was incorrect under the statute. And it seems like if we adopted the rule you're advocating, we'd be creating a circuit split with the Sixth Circuit in the Sofco case you mentioned as well as the D.C. Circuit. Tell me if I'm right or wrong on that. Thank you, Your Honor, because that is, I think, probably in this case, the most interesting for the public is the interest rate issue because it's been the subject of a lot of litigation over the last several years. And just for some background, it's the funds actuary who calculates the withdrawal liability amount. And in order to do that, he has to calculate what the UVB is. And I don't, unless you need me to go through what a UVB is, I'm glad to do that. Well, I just have a more fundamental question. And I thought the D.C. Circuit opinion just last month did a pretty good job of laying this out. And the statutory language, I mean, you're trying to latch on to, well, it has to be reasonable. But the statutory language goes further and says that it has to be the best estimate of anticipated experience under the plan. So my question to you is, did the actuary in this case look at the plan itself? My understanding is he did not, that he looked at an interest rate that the board uses, you know, generically. But did he tailor that at all to the plan? Yes, he did. He looked at other factors other than just the interest rate. And I think that's where we're getting bogged down on the interest rate issue in this case. What's critical is the actuary's best estimate of anticipated experience under the plan. And it's the actuaries, not the plan trustees, not lawyers, not even judges, it's the actuary who makes that determination. And if you look at the U.S. Supreme Court case in Concrete Pipes, they address the evidentiary burden on the contesting party in overcoming the presumption. And the presumption in this case is – Counsel, I totally agree with you. The presumption is your best argument here. But I don't think the presumption gets you very far if there's a legal error. And that's what we're trying to determine is that the language says he has to use the best estimate of anticipated experience under the plan. I don't know how you can say that that just gives him unfettered discretion. The actuary, when it clearly says he has to use the best estimate anticipated under the plan. So tell me where he looked at the plan and said this discount rate is based on – you could have plans that do a whole bunch of things, and the D.C. Circuit addressed this. You could have a risk-free plan. You could have a high-risk plan. Those would both have different interest rates. Where did he look and say this interest rate corresponds to this plan? If you look at pages 26 and 27 of our opening brief, you'll see the factors that the actuary used in this case to come up with the interest rate and why he used the PBGC interest rate as opposed to the funding rate. And insofar as what he did, he testified that the rate he used was used by his firm for years. He testified that nobody influenced his decision at GCIU, that the interest rate he used was sanctioned by actuarial literature, and most importantly, that because the withdrawal assessment can never be changed or corrected, using a conservative interest rate was his best estimate of the plan's experience. And this aligns with the analysis made by this court in the Citrus Valley case, where that's exactly what they said the actuary is to do. And that case wasn't even a withdrawal liability case. That case was the funding rate issue with the same language being analyzed. It's more important in a withdrawal liability case, if I may give you an analogy. I think what you're saying is the interest rate is actually more important in a withdrawal liability case. But to me, that suggests that it should be more tailored to the fund itself than Citrus suggested. Well, the issue with the interest rate can be really kind of condensed into this analogy I like to use, is if I'm a financial planner and a 40-year-old person comes into my office and wants to invest some money that he has, and he wants to stay with me for a number of years, I'm going to look at what I'm doing for him a lot differently than if a 67-year-old, I'm 67 so I'll use that number, so an older gentleman comes in and has, here is what I've got. I'm never going to make it, I've stopped working, I'm never going to make any more money, so here's what I've got and I need this to last me the rest of my life. So that financial planner then has to take that corpus and decide what to do with it, given the fact that that person is never going to, that there's no do-overs, because that person is never going to have more money to invest. Whereas the 40-year-old, well, if we make a mistake, you may earn more money or you may need less money or who knows, you may get a windfall somewhere down the line, so we can make adjustments. But with that 67-year-old, you can't make that adjustment, and that's what's going on in withdrawal liability versus the funding rate. With the funding rate, we can say 8% or whatever the number is. If we turn out to be wrong and we underfund the benefits, we can do things to make that we can up the ante so the participants have to pay more. We can lower the benefits. We can do a bunch of things to adjust that. We can't do that with withdrawal liability. I know you want to save some time, but I have one quick question for you. Why didn't the fund assess withdrawal liability in 2006, at the time the Daily Breeze and the Sentinel were acquired? I'm sorry. Why didn't the fund assess withdrawal liability in 2006, at the time that the Daily Breeze and the Sentinel were acquired, rather than waiting? Well, I don't know that they did or they didn't. That's the problem. There's nothing in the record that shows me they did or there's nothing in the record that shows me they didn't. If there's nothing in the record that says they did, then we can assume they didn't, right? You're not going to assume that they assessed something when there's nothing in the record, right? Well, again, I'm not making the argument. They're making the argument. It's their burden to show one way or the other. So I go back. With respect, clearly there are certain burdens here, but the fact is the fund, based on what I've seen, simply did not assess withdrawal liability in 2006. I would have thought that would have been the normal thing to do. And my question is, why didn't it happen? There's nothing in the record that says they did. That's not their burden. That's your burden, is it not? Well, I mean, it's their burden to show that the assessment was incorrect. I get that, but if there was no assessment done at the time of the withdrawal in 2006, then the question is, why wasn't that done? That's a question for the fund, is it not? I see my… Okay. I understand your question. I can't answer it any more than I did. They have to answer that, right? I think it's their responsibility, it's M&G's responsibility to answer that, not ours. Other questions by either of my colleagues, ladies and gentlemen? All right. Thank you very much, sir. Thank you. All right. We're here for counsel from M&G. May it please the Court, James Tice on behalf of M&G Enterprises. Unless the Court has a specific question about what we just spoke about, I think I'll begin with where the Court began, which is with the successorship issue, the cross-appeal issue we raised. Can you address Judge Smith's question? It is a little odd that this wasn't addressed in 2006 or 2007. We agree, Your Honor. The Daily Breeze withdrew and stopped contributing. And they fully withdrew, right? Completely withdrew. And your argument is after a complete withdrawal, you can't have partial withdrawal liability. That's correct. That's correct. But on the successorship issue in particular, the record shows on ER-5, that's the district court's factual recitation that relies on the arbitrator's factual recitation, it says that the fund completely stopped contributing to the fund entirely. The Daily Breeze last contributed to the fund in 2005, and then in 2006 the Santa Cruz Sentinels assets were completely sold, and by 2007 it had stopped contributing as well. So there's no dispute about that. There also is no dispute about the fact that no partial or complete withdrawal liability was ever assessed against either withdrawing employer at the time that they withdrew. But M&G continued to pay from 2007 until 2014. M&G owns a number of newspapers, and it's part of a control group. I mean, we're simplifying a bit here, and it was contributing for other newspapers, but those two particular newspapers had sold their assets and had stopped contributing to the fund. At that time, and under the pretty clear rules we think of 29 U.S.C. 1383, those employers had a complete withdrawal, each one of them, and at that time they should have been assessed withdrawal liability for whatever withdrawal liability they might have owed. You're not making that argument here. Well, I guess you are making that argument in the sense that you're saying you shouldn't even have any. You're saying you shouldn't have any liability because you don't get any of their successor liability. For successor liability, Your Honor, that's correct. To be very clear, my client, M&G Enterprises, does owe withdrawal liability to the fund, approximately $15 million, which is for these two assets or for other ones. For its own withdrawal liability. It owes lots of money to the fund. It's paid every dime. It's owed to the fund over the years it did contribute. But your argument on appeal is whatever is attributable to these two newspapers, Sea Breeze and— Hailey Breeze and Santa Cruz Sentinel, correct. Okay. That should not enter into the liability at all. That's correct, Your Honor. What I'm trying to say is although M&G Enterprises has contributed fully to the fund, it's contributing an additional $15 million or so based on the plans under funding. That's its fair share. What it doesn't want to do is pay double that, which is essentially what the fund's errors have amounted to, by the three errors at issue in this appeal, one of which is attributing the contribution histories of those two employers to M&G Enterprises. And it gets confusing. I know, but— What if we were to say you did have successor liability because you were on notice, and that seems to be what—I mean, I don't want to jump ahead. You'll disabuse me of why—I forget our case. A resilient floor covering doesn't require successor liability. But if we said you do have successor liability, is there any avenue— I don't think this argument's been made that the whole thing was done wrong, that it should go back and they should figure out maybe you can't do this. You can't put it back in the box. You can't figure out what withdrawal liability in 2006 would have been. Let me try to be as clear as possible about this, because I do think there's some confusion based on the resilient flooring and heavenly HANA cases. Those cases say that—imagine the same facts as our case, but in 2005 and 2007, when the two employers withdrew, they were assessed withdrawal liability at that time. In that case, the heavenly HANA and resilient flooring line of cases would come in, and the question would be, was M&G Enterprise a successor that owes the withdrawal liability of those two withdrawing employers? But that's not what happens here. Those two employers withdrew. They were never assessed withdrawal liability. Approximately seven or eight years later, the fund attributed their contribution histories, which is not a liability at all. It is just a factor that goes into a seller's withdrawal liability calculation. It said, we're going to take the contribution history, and we're going to use that to inflate your liability, M&G Enterprise. We're going to inflate your liability with that. So basically, they took a common law doctrine that we do not have any quarrel with for purposes of this appeal. That is an established line of cases. But that goes to when a successor succeeds to someone else's liability, not when it succeeds to someone else's contribution history. But I didn't read the resilience to say that the difference you seem to be making is the actual amount of liability has to be predetermined, and then that's notice. I didn't read those cases to require that. I read those cases to say, as long as you were on notice that there was some liability here. And when you purchased, you were on notice that there was liability there. Indeed, Your Honor. Potential liability. I think it's contingent liability, and it's contingent liability even for withdrawal liability. The plan does not have to assess until as soon as practicable following the withdrawal. So even in a circumstance where resilient flooring or Heavenly Hana comes in, that's still a contingent liability. And it's true that asset purchasers, as part of a due diligence exercise, will try to figure out who's going to have to pay this liability. But that is sort of what makes the fund's theory here so insidious. It makes those sorts of asset purchases impossible because you don't actually have any way of knowing at the time of the sale, is the fund going to assess withdrawal liability now, or are they just going to inflate our withdrawal liability five or six or ten years down the road using the contribution history? That really troubles me. I used to be a transactions lawyer primarily, and I look at this situation and I think, how in the heck can your company figure out what is owed here? Because you don't know when it's going to come, what's going to be included in it, how much interest is involved in it. Those kinds of things are almost always calculated at the time of the sale or the acquisition, and usually the fund would assess it and people would know what it was. Otherwise, it's just a pig in a poke. You have no idea what it is, which to me would be completely to the contrary. What we want to do is to have businesses continue, not just go out of business into bankruptcy and never return, but they've got to be able to calculate what the liability is when they acquire them. Isn't that correct? That's absolutely correct, Your Honor, and that's absolutely the system that Congress designed. It says very clearly, 29 U.S.C. 1383, at the time your obligation to contribute ceases, withdrawal liability should be assessed. Is there a statute of limitations? Is there a time period on that? That's what's very interesting about this case as well, Your Honor. Congress did not actually put a time limit on the assessment of withdrawal liability. It said in Section 1399, you should assess it as soon as practicable. In our view, as soon as practicable has long since passed because it's been quite some time, but they haven't even tried to assess withdrawal liability, even belatedly, and tried to argue that it was still as soon as practicable. Could you even do it? I mean, if we sent this back and said, okay, there was some successor liability that was owed in 06 and 07, yeah, they waited, is that even possible to reconstruct at this point? I don't think it's for purposes of this present dispute. I think, again, if a fund wanted to send an assessment notice to the two withdrawing employers and or whoever they thought was their successor now and say, by the way, you owe this withdrawal liability from withdrawals in 2005 and 2007, they could try to do that. But that would presumably be a much lower amount than $15 million. Well, I think that's right, Your Honor. And, in fact, one of your honors asked my friend on the other side earlier, why was this not assessed in 2005? And I think one very good reason is that in 2005, the plan was adequately funded, such that there was no withdrawal liability for the Daily Breeze at the time it withdrew. We note this. It's on the fourth brief on cross-appeal, our second brief, on pages 11 and 12, note 2. We point this out that in 2005, the plan was actually adequately funded when Daily Breeze left, so the plan could not have assessed withdrawal liability. So if we accept your argument, we would say, look, we don't know what happened here, but all we know is this is not the right process. We're vacating this whole thing. Send it back. Theoretically, they could start a new case, and then you could have all these arguments. That's not for us to get into today. To be clear, I think, Your Honor, we would urge, as you affirm in part and reverse in part, reverse on this one on the successorship issue. We agree with what the district court did on the other two issues. Affirm on those two issues, reverse on this part, and send it back to the arbitrator with instructions to tell the fund to recalculate the amount without this mistake it made on successorship. What is your best argument that successor liability ought not to apply in this situation? Well, successor liability, again, is, in our view, a method for attributing a liability from one entity to a successor. It's not a method for attributing one of the factors that goes into the liability calculation, which is what contribution history is. And I think the best response we have, again, is this is we don't quarrel with resilient flooring or heavenly Hana in an appropriate case. Successor liability is alive and well and could be appropriate, but as a crucial predicate for those cases to apply, there needs to be a withdrawal liability assessment in the first place. And the contribution should not apply in this formula, right? Yes, and I think, Your Honor, I think another way of getting at this same response is that if you look at Sections 1383 and 1384 next to each other, again, 1383 says once you no longer have an obligation to contribute, at that point there's a complete withdrawal, and withdrawal liability should be assessed as soon as practicable. 1384 actually creates a limited exception that essentially mirrors the facts of what happened here. It says that ordinarily, a seller, an asset seller, does completely withdraw as soon as they lose their obligation to contribute, but we're going to create an exception and say, actually, the seller won't withdraw and the purchaser will take their contribution history, but only if certain conditions are met that will protect the plan going forward, namely an obligation for the purchaser to continue contributing in substantially the same amount, a bond to protect the plan, and an agreement that the seller will be secondarily liable. So all those things basically account for this exact situation. Congress created a mechanism to say, yes, in certain circumstances, we will not require a seller to pay withdrawal liability as soon as it withdraws from the plan, but only if the purchaser and seller take steps to protect the plan. That didn't happen here. Under the ordinary rule, the seller is supposed to pay withdrawal liability. Here's my question. What happens just globally here? I assume there's like $30 million of liability, it sounds like, from what you're saying, 15 from this other one. Presumably that $30 million is deemed necessary to get the plan's solvent. The calculation that goes into it? Your Honor, not exactly because, again, what's essentially happened is our client owes withdrawal liability for its share of the plan's underfunding as of the time it withdrew. That was part of what the arbitrator decided was the full $30 million, or did the arbitrator only decide the $15 million? Obviously only the $15 million is before us. We believe that we should owe approximately $15 million. The fund's mistakes in total essentially doubled that. Because the arbitrator agreed with us on two of the three issues, the total amount currently is less than that, but if you fully agree with us, we will just pay what we believe is our fair share, which is $15 million approximately. Can I go back for just a minute? I think you earlier answered the question that I asked of your colleague, and that's why they didn't assess anything. You said that the Daily Breeze was fully funded, so there was nothing to assess. What about the Sentinel? There were some unfunded vested benefits at the time that the Sentinel withdrew, so there was some liability at that time. And so the employer, again, the fund should have assessed the Santa Cruz Sentinel at the time it withdrew, and then the fund could have collected that money either from the Santa Cruz Sentinel at that time, which is what we suggest should have happened, or it could have tried to go after a successor under the Heavenly Ana Resilient Flooring Successive Liability Theory. And did those two newspapers fully withdraw? Correct. And there's just no question about that. So the idea of a partial withdrawal later wouldn't apply according to your understanding, right? That's correct, Your Honor. Well, I mean, that gets into a slightly separate issue, but, yes, there's certainly no – we don't think under ordinary rules of English and basic common sense that a partial withdrawal can follow a complete one, and I'm happy to go into that if you'd like. I actually want to take you – what do we do with the payments that were made by MNG? I mean, well, let me back up. The fund is arguing that you had the duty to step forward. I mean, you knew – MNG knew that there was some potential liability here. They sort of – I don't know. Did they look the other way? Did they make payments and say, oh, we already owe this other money, so we'll figure this out later? I mean, what really went on here? Because it does seem odd that you – I mean, to a certain degree, by not stepping – by saying – by understanding that there was some liability but not stepping up and saying, well, hey, can you tell us what the liability actually is? I mean, do you just get to go back and get the benefit of sitting silent on that? Well, I don't think that's quite right, Your Honor, for a couple of reasons. I mean, first of all, I've been trying to simplify this as much as possible to say MNG Enterprises, but in reality it's a bunch of different entities, all part of a control group, so it's – and there was different owners in between. In the money that was paid from after the purchase in 2007 through 2014, was any of that money paid into the fund paid by an entity that would have had control or responsibility or payments that would have been attributable to Sentinel and the police? Your Honor, I don't believe so. But to be clear, MNG Enterprise Control Group owns a number of newspapers. Through collective bargaining agreements, they're contributing lots of money to the fund based on all the different newspapers they owe. There's different entities that make up the MNG Control Group, which is basically treated as a single employer even though it's multiple different entities. So over time there are – again, MNG Enterprise has paid millions and millions of dollars to the funds over time and has paid every penny its collective bargaining agreements owe. Is there any way to segregate that out to say this is how much was paid on behalf of these two newspapers versus everything else? No, Your Honor, because essentially they've sold their assets and gone out of business at that time. There's no longer contributions flowing in from those entities after 2005 or 2007. Again, the appropriate circumstance in that course is for the fund to say, now that you've stopped contributing, here is your portion of the unfunded benefits or the withdrawal liability, your proportionate share of the total plans under funding that you owe. And if the entity that goes out of business can't pay it, then you might be able to go after a successor entity. And again, Congress did not set a strict time limit. It said as soon as practicable. So you could see in certain circumstances if there were actually – Are there any cases where somebody's – where this has been held waived? Is there any case law that defines as soon as practicable? Your Honor, the best we could find is there's a Supreme Court case called Bay Area Laundry. It's 522 U.S. 192. It essentially says that Congress made a deliberate legislative choice to afford some flexibility in gathering the information and performing the complex calculations necessary to make the assessment. They just basically – I mean the fund just basically forgot. It treated it like a latches situation. So again, the proper way to do it, the way that Congress set out, is for the fund to assess the withdrawing employer, and then you can try under successorship principles to get that liability from a successor entity. It just doesn't make sense the way they did it because it really messes with the statutory scheme. It creates a whole bunch of unfortunate consequences, including hurting the fund in many circumstances. In a lot of circumstances, if M&G Enterprises had never withdrawn at all, then all of the remaining employers in the group would owe the share of unfunded liabilities from the Daily Breeze and Santa Cruz Sentinel. If we go your way on this issue, do we need to reach the second in the interest rate issue? Yes, Your Honor. All three are separate grounds. They're all – they're three distinct errors. But you seem to be saying – and that's what I'm trying to flesh out. Sorry, I know we're taking you over, but this is important. No, please. You seem to be saying you don't have any liability here because the fund didn't – so I must be misunderstanding you because you sort of seem to be saying, well, because of latches, we don't have any liability. That's not what you're saying. That's not what we're saying at all, Your Honor. To be clear, M&G Enterprises is a control group. It's a number of entities that are together. You agree you owe the $15 million, but do you owe any money that's attributable to Sentinel and the Breeze's newspapers? Not at this time because the fund has never assessed them. But you're not disagreeing. You're saying, hey, we'll pay what we owe. We just don't think you calculated it correctly. You've got to go back and do it based on withdrawal liability looking back to 06-07. To be clear, Your Honor, if they try to assess Daily Breeze and Santa Cruz Sentinel's withdrawal liability a decade after the withdrawals, we will raise whatever defenses are available to us, including latches. We don't think it's actually as soon as practicable. Having said that, that is the proper way to do it, and if they want to try to get the money that way, we can have an argument about whether we're true successors and whether they waited too long. And that's why I'm wondering why we're deciding the interest rates separately because, I mean, if we send this back, we are going to say, latches, we don't owe you anything for what happened in 06-07. To be clear, Your Honor, M&G Enterprises owes its own withdrawal liability, separate and apart from this. This is just a way that they use to inflate the withdrawal liability that my client owed. But M&G Enterprises did withdraw in 2012 and 2013, I believe. No, 2013-2014, and it owes its own withdrawal liability, and it's paying that withdrawal liability right now. But that's not on appeal to us. That's not on appeal to us. Those are the issues that involve the partial. So let me just take one step back. M&G Enterprises owes withdrawal liability, and we think it's approximately $15 million that we owe. But what we're saying is— The interest rate still goes into some of those as well. We're saying the fund inflated M&G Enterprises withdrawal liability in three ways, the partial after the complete, the wrong interest rate, and— So in a way, that other $15 million is still before us in the context of the interest rate. And it attributed the contribution histories of employers that are withdrawn to us when we don't think there's any basis to do so under the successorship liability doctrine. Other questions from my colleagues? All right. Thanks very much, Mr. Ticey. Thank you very much. Thank you, Mr. Ticey. Do either of my colleagues have additional questions for Mr. Cordo? We took him over. I don't. Okay. Do you have any other questions? For the rebuttal? Yeah. Well, he went over his time, so normally he wouldn't have a rebuttal, but we can give him one if you have additional questions. I think he should. I mean, I'd like to hear a minute. Okay. Why don't you come up? We'll give you a couple of minutes to give us a rebuttal. Thank you. Thank you for the extra time as well. In terms of sections, I know sections 1383 and 1384 were mentioned. Those sections don't apply in this case. This is not a transaction that comes under those two sections, and, in fact, the case law is very clear that 1384 is designed to protect the buyer, not the seller. So I just want to clarify that point, Your Honors. With respect to the actuarial assumptions in the UVB, I think it's important to understand what the statute says. And the statute says that the actuary determines the UVB, i.e., the interest rate, by using actuarial assumptions and methods, which in the aggregate are reasonable. And then in parentheses, taking into account the experience of the plan and reasonable expectations. Reasonable expectations. And that's exactly what Mr. Barker did here. He looked at what he thought was reasonable, given the fact that we have a withdrawal liability number that is immovable, so to speak. So in order to have the purposes of ERISA met, he was more conservative. Wouldn't you agree, if we said you can't have a partial withdrawal liability after a complete withdrawal, doesn't this have to be redone based on the complete withdrawal? You agree that a complete withdrawal happened in 06, right? Yes. So why don't we just send this back and say, look, all of this was done wrong because the complete withdrawal has to be based on 06. You agree that wasn't done. There was no complete withdrawal liability calculated based on 06 when the complete withdrawal first happened. Again, I don't see it in the record one way or the other. Very well. We are now over the two minutes. I appreciate the extra time. We thank both gentlemen for your argument. We appreciate it very much. The case just argued is submitted.
judges: SMITH, NELSON, UNKNOWN